FILED
2012 Jul-19  AM 10:31
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JACOB O'NEAL MEARS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-09-S-2540-NE** |
| | ) | |
| **BRETT McCULLEY, and CITY** | ) | |
| **OF HUNTSVILLE, ALABAMA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Jacob O'Neal Mears commenced this action against the City of Huntsville and one of its police officers, Brett McCulley, in the Circuit Court of Madison County, Alabama. Based upon the fact that plaintiff's state-court complaint *appeared to assert* at least two claims based upon the United States Constitution,[1] defendants timely filed

---

[1] The state-court complaint was not a model of clarity. It indiscriminately mixed common-law claims with allegations of federal Constitutional violations. For example, Count I alleged that, "[b]y falsely arresting Jacob Mears . . . Brett McCulley and the City of Huntsville, Alabama acted negligently, recklessly, maliciously, willfully, in bad faith in excess of their legal authority, *in violation of the rights afforded to Jacob Mears by the Fourth and Fourteenth Amendments to the United States Constitution*." Doc. no. 1 (Notice of Removal), Exhibit "A" (state court complaint ¶ 12) (emphasis supplied). In like manner, Count II alleged that, "[b]y falsely imprisoning Jacob Mears . . . Brett McCulley and the City of Huntsville, Alabama acted negligently, recklessly, maliciously, willfully, in bad faith and in excess of their legal authority, *in violation of the rights afforded to Jacob Mears by the Fourth and Fourteenth Amendments to the United States Constitution*." *Id*., ¶ 15 (emphasis supplied). For such reasons, defendants acknowledged that plaintiff's original complaint

> arguably leaves some uncertainty as to whether federal claims [were] subsumed within Counts I and II. For this reason, prior to removing this action, defendants requested, in writing, clarification from plaintiff regarding the existence of such

notice of their intent to remove the action to this court based upon federal question jurisdiction.  *See* 28 U.S.C. §§ 1441, 1446.

The case now is before the court on defendants' motions to enter summary judgment in their favor on all claims alleged in plaintiff's Second Amended Complaint,[2] which asserts six claims against Officer McCulley — three of which are based upon the Fourth and Fourteenth Amendments, and asserted under 42 U.S.C. § 1983[3] — and seven claims against the City of Huntsville, four of which are based upon the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.[4]

Upon consideration of the pleadings, briefs, and evidentiary submissions, the court concludes, for the reasons stated in the remainder of this opinion, that both motions for summary judgment are due to be granted.

## I.  SUMMARY OF RELEVANT FACTS

federal claims.  Because this request went unanswered, defendants were forced to conclude that federal claims were in fact asserted by plaintiff.  Therefore, defendants have timely removed this action to avoid any waiver of their removal rights.

Doc. no. 1 (Notice of Removal) at 2 n.1.

[2] *See* doc. no. 27 (Second Amended Complaint); doc. no. 35 (Motion for Summary Judgment by the City of Huntsville); doc. no. 36 (Officer McCulley's Motion for Summary Judgment).  The defendants submitted a joint brief in support of their respective motions for summary judgment.  *See* doc. no. 37 (Brief in Support of Motions for Summary Judgment).

[3] The remaining three claims against McCulley are for negligence, "false arrest/imprisonment," and "violations of Alabama state law."  *See* doc. no. 27 (Second Amended Complaint), at 4-10.  To the extent this court has jurisdiction of those state-law claims, it is through the court's "supplemental jurisdiction" under 28 U.S.C. § 1367.

[4] The three supplemental, state-law claims against the City are for negligence, "false arrest/imprisonment," and "violations of Alabama state law."  *Id.*

A white male entered the Regions Bank branch located at 2015 Sparkman Drive in Huntsville, Alabama, at 9:50 a.m. on November 26, 2008, and slid a note in front of bank teller Jermaine Edwards that read: "I got a gun and I ain't playing.  I want all loose bills.  100s, 50s, 20s, 10s, 5s, 1s.  Don't act stupid.  I will shoot you."[5]  Edwards gave the robber $4,352 in United States currency, and he fled the scene.[6]

Officers from the Huntsville Police Department, including defendant Brett McCulley, responded to the bank's alarm.  The bank teller gave a verbal and written statement describing the perpetrator as a white male in his mid-30s, approximately 6'2" tall, and wearing a blue jacket and baseball cap.[7]

## A.    Plaintiff Is Identified By His Aunt and Uncle

Sherry and William Johnson are the aunt and uncle of plaintiff, Jacob Mears. They viewed a television news broadcast that included coverage of the bank robbery that had occurred earlier in the day.  A photograph of the robber taken by the bank's surveillance camera was included in the broadcast.  The Johnsons remarked to one

---

[5] Brief in Support of Motion for Summary Judgment, at 1-2; doc. no. 42 (Brief in Opposition to Motions for Summary Judgment), at 1; doc. no. 38-13 (City of Huntsville Police Department Calls for Service Report); doc. no. 38-32 (Robbery Note).

[6] Brief in Support of Motions for Summary Judgment, at 2; Brief in Opposition to Motions for Summary Judgment, at 1.

[7] Brief in Support of Motions for Summary Judgment, at 2; Brief in Opposition to Motions for Summary Judgment, at 1; *see also* doc. no. 38-4 (Deposition of Jermaine Edwards), at 12-14; doc. no. 38-34 (Written Statement of Jermaine Edwards).  Plaintiff was a 28 year old white male and 6'0" tall at the time of the robbery. *See* doc. no. 38-25 (Plaintiff's Booking Sheet), at 2; doc. no. 38-1 (Deposition of Plaintiff), at 264.

3

another that the perpetrator resembled Sherry Johnson's nephew.[8] Utilizing a feature on their television set that allowed live broadcasts to be recorded and "rewound," the Johnsons viewed the news story several more times.[9]  Eventually, William Johnson telephoned the Huntsville Police Department and spoke with a dispatcher.[10] He said: "Well, judging from the surveillance cameras, he [the robber] kind of favors my nephew a little bit. . . . I mean it's not a real clear picture of him, but from where we're sitting it looks a lot like him."[11]  Johnson provided his name and telephone number, and the dispatcher said that she would have a police officer contact him.[12] The dispatcher conveyed the substance of William Johnson's report to defendant Brett McCulley, who immediately returned the call and arranged to meet both Johnsons in the parking lot of a school near their home.[13]

When Officer McCulley arrived at the school, he first showed the Johnsons a photograph of plaintiff.  (The photograph contained identifying information below the

---

[8] *See* doc. no. 38-7 (Deposition of William Johnson), at 8-9; doc. no. 38-8 (Deposition of Sherry Johnson), at 5-9.

[9] *See* Deposition of Sherry Johnson, at 6-8.

[10] Brief in Support of Motions for Summary Judgment, at 3; Brief in Opposition to Motions for Summary Judgment, at 1-2; *see also* Deposition of William Johnson, at 9-10.

[11] Doc. no. 38-10 (Recording of Telephone Call from William Johnson to the City of Huntsville Police Department).

[12] *Id.*

[13] Brief in Support of Motions for Summary Judgment, at 4; Brief in Opposition to Motions for Summary Judgment, at 1-2; *see also* doc. no. 38-10 (Recording of Telephone Call from City of Huntsville Police Department Dispatcher to Officer McCulley); doc. no. 38-2 (Deposition of Officer McCulley), at 12-13; Deposition of William Johnson, at 11-12.

4

image, but the record is unclear as to whether the photograph was a "mug shot," or a driver's license photograph of plaintiff.)  Both Sherry and William Johnson identified the individual depicted in the photograph as Sherry's nephew.  Officer McCulley then showed the Johnsons a photograph snapped by the bank's surveillance camera.[14] William Johnson stated that he was not certain that the person depicted in the surveillance photograph was their nephew, but he resembled plaintiff.[15]  Specifically, he said that he "wasn't 50 percent sure . . . fifty to seventy-five percent sure maybe" that plaintiff was the perpetrator.[16]  He also stated that the clothing worn by the robbery suspect "looks like about what style [plaintiff would] wear."[17]  In like manner, Sherry Johnson said that she was not certain that the person depicted in the bank surveillance photographs was her nephew, but agreed with her husband that the suspect looked "a lot similar" to Jacob Mears.[18]

## B.   Further Investigation

Officer McCulley returned to his office, where he determined that plaintiff's home address was in Limestone County, Alabama.  He also discovered that plaintiff

---

[14] *See* Deposition of Officer McCulley, at 14-16, 23-24; Deposition of William Johnson, at 1-14, 30-31, 36; Deposition of Sherry Johnson, at 10-11.

[15] *See* Deposition of William Johnson, at 23.

[16] *Id.*

[17] *Id.* at 14-15, 24-26.

[18] Deposition of Sherry Johnson, at 11-12; *see also* Deposition of William Johnson, at 31-32.

previously had been convicted of armed robbery: he had pled guilty in February of 2001 to a charge of robbery in the second degree, for robbing a grocery store while armed with a knife.[19]

Officer McCulley then contacted the Limestone County Sheriff's Office, and arranged for two deputies to meet him at a location in Athens, Alabama. McCulley arrived in his unmarked automobile, accompanied by two City of Huntsville uniformed patrol officers driving a marked police cruiser. They met Lieutenant Jay Stinnett and Deputy Jonathan Hinton of the Limestone County Sheriff's Office at a golf course outside Athens at 7:35 p.m. Lieutenant Stinnett and Deputy Hinton were in two marked patrol cars.[20]

Officer McCulley informed Lieutenant Stinnett and Deputy Hinton that Jacob O'Neal Mears was a suspect in the Huntsville bank robbery that had occurred earlier that day because Mears's uncle had seen the surveillance-camera photograph of the perpetrator broadcast during a television news account of the robbery, and telephoned police to say that it was his wife's nephew.[21] McCulley showed Stinnet and Hinton

---

[19] Brief in Support of Motions for Summary Judgment, at 5; Brief in Opposition to Motions for Summary Judgment, at 2-3; doc. no. 38-43 (Circuit Court of Madison County, Alabama Case No. 2000-2690), at 3, 9, 16-17, 21-22.

[20] Brief in Support of Motions for Summary Judgment, at 6; Brief in Opposition to Motions for Summary Judgment, at 2-3; Deposition of Officer McCulley, at 26-27; doc. no. 38-5 (Deposition of Deputy Hinton), at 13, 30-31.

[21] Deposition of Deputy Hinton, at 16, 21; doc. no. 38-6 (Deposition of Lieutenant Stinnett), at 9-11. Officer McCulley testified that he never informed the Sheriff's Deputies that plaintiff was

a photograph taken by the bank's surveillance camera, and asked whether they recognized the perpetrator. Lieutenant Stinnett, who knew plaintiff from booking him into the Limestone County Jail during a period that Stinnett had worked as a jailer, said that the individual in the photograph looked like Mears. Deputy Hinton, who knew plaintiff from living and working in the community in which plaintiff resided, agreed.[22]

## C.   The Arrest

The five officers — Officer McCulley, the two Huntsville uniformed police officers, Lieutenant Stinnett, and Deputy Hinton — proceeded to plaintiff's home in Limestone County, outside the corporate limits of the City of Huntsville. They arrived about 7:45 p.m. Plaintiff was at home with his long-time girlfriend (and, later, wife), Bridget Gatlin, and their two children.[23] He was seated in the living-room at the front of the house, watching television. The front-entrance to the residence consisted of a glass exterior door and a solid interior door. The solid door was open, allowing persons outside to see into the house, and *vice-versa*.[24] When plaintiff saw the law

---

the suspect he was looking for until after they had identified the perpetrator in the photograph as plaintiff. Deposition of Officer McCulley, at 27-30.

[22] Deposition of Deputy Hinton, at 7-10, 16-17, 22, 27; Deposition of Lieutenant Stinnett, at 5-10, 23.

[23] *See* doc. no. 38-1 (Deposition of Plaintiff), at 139; doc. no. 38-3 (Deposition of Bridget Gatlin), at 18. Plaintiff and Gatlin were married on July 14, 2009, after the events leading to this suit. Deposition of Bridget Gatlin, at 16.

[24] *See* Deposition of Plaintiff, at 139; Deposition of Bridget Gatlin, at 27; Deposition of

enforcement vehicles arrive and park in the driveway and along the street in front of his house,[25] he ran toward the back of the house, and hid in the laundry room.  While running, he instructed Gatlin to tell the officers that he was not home.[26]

Officer McCulley looked through the glass door as he approached the house, and saw plaintiff run to the back.[27]  McCulley and the other officers entered the home with their weapons drawn.[28]  McCulley asked Bridget Gatlin where plaintiff was, and she said that he was not home.[29]  McCulley walked toward the rear of the house, in the direction that he had seen plaintiff run, and found him hiding in a dark laundry room. McCulley handcuffed plaintiff.[30]   The officers then searched "everything in the house," including several closets and a box in which plaintiff's children stored their toys.[31]  Bridget Gatlin asked whether the officers had a search warrant, but McCulley

---

Lieutenant Stinnett, at 16.

[25] Doc. no. 37 (Brief in Support of Motions for Summary Judgment), at 7; doc. no. 42 (Brief in Opposition to Motions for Summary Judgment), at 3-4; Deposition of Officer McCulley, at 34-35, 193-95; Deposition of Deputy Hinton, at 30-31.

[26] *See* Deposition of Plaintiff, at 142-47; Deposition of Bridget Gatlin, at 23-24, 32-33.

[27] *See* Deposition of Officer McCulley, at 36; Deposition of Plaintiff, at 161-62.

[28] Deposition of Bridget Gatlin, at 18, 29-30, 49-50.

[29] *Id.* at 29-30.

[30] Deposition of Officer McCulley, at 46; Deposition of Plaintiff, at 143; Deposition of Bridget Gatlin, at 31-32.

[31] Deposition of Bridget Gatlin, at 19.  Officer McCulley and Lieutenant Stinnett dispute Gatlin's testimony.  They assert that Stinnett asked Gatlin for permission to search the home for plaintiff, she consented, and the search was limited to spaces where plaintiff could hide.  *See* Deposition of Officer McCulley, at 41-65; Deposition of Lieutenant Stinnett, at 17.

said they "didn't need one."[32]  The search did not uncover any items that appeared to

be related to the Regions Bank robbery.[33]  The officers, nevertheless, walked plaintiff

out of the house and placed him in the back of a police cruiser.  The officers asked

Bridget Gatlin about plaintiff's activities that day.  She initially said that plaintiff had

returned home from work between 5:00 and 6:00 p.m., but later changed her story to

say that it had been earlier, at about 2:30 p.m.  Gatlin provided McCulley with the

names and telephone numbers of plaintiff's supervisor, William Young, and the

person who gave plaintiff a ride to work that day, Dale Wise.[34]

Plaintiff was transported to the Huntsville Police Department's North Precinct

and placed in an interrogation room.  Officer McCulley read plaintiff his "Miranda"

rights and warnings.  Plaintiff waived his rights, and agreed to speak to McCulley.  He

related his activities during the day, and explained that it would not have been

possible for him to commit the robbery because he was working in Franklin County,

Alabama, at the time.[35]  Plaintiff wrote a statement containing the same information,

[32] Deposition of Bridget Gatlin, at 19.

[33] *Id.*; Deposition of Officer McCulley, at 51-64.

[34] Brief in Support of Motions for Summary Judgment, at 8-9; Brief in Opposition to Motions for Summary Judgment, at 5-6; *see also* doc. no. 38-2 (Deposition of Officer McCulley), at 68-69; Deposition of Bridget Gatlin, at 38-39; 45-46.

[35] Brief in Opposition to Motions for Summary Judgment, at 9; Brief in Opposition to Motions for Summary Judgment, at 5-6; doc. no. 44 (Reply Brief in Support of Motions for Summary Judgment), at 1; *see also* Deposition of Officer McCulley, at 74; doc. no. 38-24 (Police Report), at 2-3; doc. no. 38-39 (Plaintiff's Written Statement).

and reading as follows:

> I left for work at 5:30 or 5:45 and dale wise piked me up[.]  we went to the store[,] got me a cup of coffee[,] and went to the Bp in Moulton and got the diesals and went to franklin county recycling[.] ran track hoe until about 11:30/ or 12:00[.]  left[,] went back to the Bp station in Moulton[.]  dropped our load and got our checks from inside the store and the guy cashed my $500 dollar check for me and we left and went to a muffler shop behind burger king on Hyway 67 in priceville to get a muffler fixed[.]  left truck there and we left and ate at burger king beside it and then we went to my house[.]  he dropped me off[,] and I sat at my house until I guess 1 or 2 and went to mom & dad's to go deer hunting[,] and then at dark I went home[,] and then about an hour or less [later] the police came and got me.[36]

Officer McCulley told plaintiff that he was being charged with robbery in the first degree, and transported him to the Madison County Jail.[37]  McCulley prepared a warrant package and presented it to a Madison County, Alabama warrant magistrate on November 28, 2008, two days after the robbery.  The magistrate found that there was probable cause to arrest plaintiff for robbery in the first degree, and issued a warrant for his arrest.[38]

## D.   Post-Arrest Investigation

Officer McCulley again met with bank teller Jermaine Edwards on December

---

[36] Plaintiff's Written Statement (all capitalization and spelling errors in the original, punctuation alterations supplied).

[37] Brief in Support of Motions for Summary Judgment, at 10; Brief in Opposition to Motions for Summary Judgment, at 6; *see also* Deposition of Plaintiff, at 177.

[38] Brief in Support of Motions for Summary Judgment, at 10; Brief in Opposition to Motions for Summary Judgment, at 6; *see also* Deposition of Officer McCulley, at 94; doc. no. 38-40 (Warrant and Affidavit), at 2-3.

1, 2008: five days after the robbery.  He presented a "photographic line-up" — *i.e.*, a card to which an array of photographs of six different men had been attached, one of whom was plaintiff — and asked Edwards whether any of the individuals appeared to be the person who had robbed the bank.  McCulley did not tell Edwards that one of the photographs was of the person police believed to have been the bank robber, but Edwards knew that the police had arrested a suspect.  Significantly, Edwards identified the photograph of plaintiff as the bank robber.[39]

Plaintiff has two tattoos, one of which is on the right side of his neck. Consequently, on December 2, 2008, six days after the bank robbery, Officer McCulley had one of the bank's surveillance photographs enhanced, in order to enlarge the image of the right side of the perpetrator's neck, in an effort to determine whether the robber had the same tattoo as plaintiff.[40]  After comparing the enhanced photograph with plaintiff's tattoo, McCulley concluded that the person photographed by the bank's surveillance camera had a tattoo of the same size, type, and location as plaintiff's.[41]

---

[39] *See* Brief in Support of Motions for Summary Judgment, at 10-11; Brief in Opposition to Motions for Summary Judgment, at 6; doc. no. 38-4 (Deposition of Jermaine Edwards), at 15-23, 39-40; doc. no. 38-30 (Photographic Lineup) (showing a circle drawn around the picture of plaintiff and the signature of Jermaine Edwards and the date below the picture).  Prior to meeting with Officer McCulley and viewing the photographic line-up, Edwards had not seen any news coverage regarding plaintiff's arrest.  *See* Deposition of Jermaine Edwards, at 38-39.

[40] *See* Deposition of Officer McCulley, at 97-101.

[41] Brief in Support of Motions for Summary Judgment, at 12; Brief in Opposition to Motions

On December 10, 2008, fourteen days after the bank robbery, McCulley interviewed Dale Wise and Daryl McCurry, the co-workers with whom plaintiff said that he had spent the day of the robbery.[42]   Each man gave McCulley a written statement recounting the activities of that day.[43]   Each stated that they had picked plaintiff up for work about 5:30 a.m., and proceeded together to a gasoline station in Moulton, Alabama, arriving around 6:35 a.m.   After leaving the gas station, they drove to the Franklin County Recycling Center, arriving about 7:25 a.m., and loaded trucks onto trailers.   They then drank coffee at a restaurant located next to the recycling center.   They left the restaurant at 10:05 a.m., and returned to the gasoline station in Moulton.   They then drove their truck to a repair shop in Priceville, Alabama, arriving there at 12:10 p.m.   Finally, Wise and McCurry said that they had dropped plaintiff off at his home around 1:00 p.m.[44]   In addition, Dale Wise's statement listed William Young, Charlie Campbell, Landon Boyd, Rebecca May, Sandra Kilgo, and Travis Green as other persons who knew of plaintiff's whereabouts on the day of the robbery.[45]   The only person on that list whom Officer McCulley may

---

for Summary Judgment, at 6-7.

[42] *See* Deposition of Officer McCulley, at 88-91.

[43] *Id.*; doc. no. 38-37 (Statement of Dale Wise); doc. no. 38-38 (Statement of Daryl McCurry).

[44] Statement of Dale Wise; Statement of Daryl McCurry.

[45] *See* Statement of Daryl McCurry.

have questioned was "Sandra Kilgo," who may (or may not) be the same person identified in the following discussion as "Brenda Kilgore."[46]

After taking statements from Wise and McCurry, Officer McCulley telephoned the gasoline station in Moulton to which they and plaintiff said they had twice driven on the day of the robbery. The employee who answered the telephone said that McCulley would need to speak to the station manager, Brenda Kilgore. Consequently, the following day, December 11, 2008, McCulley drove to the gasoline station — "J-Mart store number 508" on Alabama Highway 157 — and spoke with Ms. Kilgore. She said that she had seen plaintiff at the station on the morning of the robbery, and that he was wearing a blue windbreaker.[47] She gave McCulley a videotape taken by the gasoline station's surveillance camera, but said that she did not know when the images had been recorded. The surveillance tape showed plaintiff, Wise, and McCurry inside the station's store, but (significantly) did not bear either a date or time stamp.[48]

Officer McCulley then drove to the Priceville shop to which plaintiff, Wise, and

---

[46] Doc. no. 37 (Brief in Support of Motions for Summary Judgment), at 13-14; Reply Brief in Support of Motions for Summary Judgment, at 3; *see also* Deposition of Officer McCulley, at 90-92.

[47] Note well that the bank teller described the robber as wearing a blue jacket, and that Sherry and William Johnson confirmed that such a garment was typical of their nephew's usual mode of dress.

[48] Brief in Support of Motions for Summary Judgment, at 12-13; Brief in Opposition to Motions for Summary Judgment, at 6-7; *see also* Deposition of Officer McCulley, at 143-47.

McCurry said they had taken their truck for repairs on the day of the robbery. McCulley showed the shop owner and employees a photograph of plaintiff, and asked if he had been in the shop on November 26th.  The owner and employees all said that they had only a few customers on the day of the robbery, and denied that plaintiff, Wise, or McCurry had been among them.[49]

Officer McCulley later checked to see whether any fingerprints of the bank robber had been recovered from the crime scene, but was told that no prints of value had been lifted from either the demand note or the counter at which it had been presented.[50]

E.    **The Extradition Hold**

On December 10, 2008 — the same day that Officer McCulley interviewed Wise and McCurry, talked to Brenda Kilgore, and questioned the owner and employees of the Priceville repair shop — McCulley also received a telephone call from a detective in Kingsport, Tennessee, saying that the physical description of the perpetrator of the Regions Bank robbery in Huntsville and the content of his demand note matched those of the person who had robbed a bank in Kingsport, Tennessee.

---

[49] Brief in Support of Motions for Summary Judgment, at 13; Brief in Opposition to Motions for Summary Judgment, at 6-7; *see also* Deposition of Officer McCulley, at 148-52.

[50] Brief in Support of Motions for Summary Judgment, at 13; Brief in Opposition to Motions for Summary Judgment, at 6-7.

14

The detective asked for an extradition hold to be placed on plaintiff.[51]

## F.   **Establishing Plaintiff's Innocence**

On January 28, 2009, two months after the Regions Bank robbery, an FBI agent contacted Officer McCulley about Michael Watson, a man suspected of robbing banks in Kingsport and Nashville, Tennessee, as well as Wichita, Kansas.  In response, the records division of the Huntsville Police Department sent information about plaintiff to the FBI agent.  Watson and his girlfriend were arrested in Hattiesburg, Mississippi on January 30, 2009, for robbing a bank there.  Watson's girlfriend provided investigators with information that linked Watson to the robbery of the Regions Bank branch in Huntsville on November 26, 2008.[52]  That same day, Officer McCulley contacted a Madison County Assistant District Attorney, who completed a release order for plaintiff and faxed it to the jail.  Officer McCulley and the Assistant District Attorney also contacted the Kingsport, Tennessee police, and the extradition hold was removed, allowing plaintiff to be released from the Madison County Jail.[53]  He had been incarcerated for sixty-six days, from November 26, 2008 through January 30,

---

[51] Brief in Support of Motions for Summary Judgment, at 14; Brief in Opposition to Motions for Summary Judgment, at 6-7; *see also* doc. no. 38-2 (Deposition of Officer McCulley), at 141-42, 176.

[52] Brief in Support of Motions for Summary Judgment, at 15; Brief in Opposition to Motions for Summary Judgment, at 6-7; *see also* Deposition of Officer McCulley, at 175-76.

[53] Brief in Support of Motions for Summary Judgment, at 15; Brief in Opposition to Motions for Summary Judgment, at 6-7; *see also* Deposition of Officer McCulley, at 176-77.

2009.[54]

## II. DISCUSSION

No one disputes that plaintiff suffered a tragic wrong as a result of his misidentification as the robber of the Regions Bank in Huntsville. Even so, "[t]he Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137, 145 (1979) (alteration supplied). The Fourth Amendment requirement of probable cause to arrest, the Sixth Amendment guarantee of a speedy trial by jury, and the Eight Amendment prohibition against excessive bail were intended to balance society's need to apprehend criminals against the risk of arresting and imprisoning innocent persons. Law-enforcement officers are human, however, and, as such, they are fallible, and occasionally arrest innocent persons, even when acting in good faith. But, as discussed below, only when the arrest is the result of a constitutional or statutory violation may a falsely arrested individual recover monetary damages for the detention, or the damage to his reputation.

### A. The Constitutional Claims Asserted Against Officer McCulley Under § 1983

42 U.S.C. § 1983 is a remedial vehicle: that is, it provides a means to seek redress against state and local governmental entities and officials whose conduct under color of state law deprives a plaintiff of rights, privileges, or immunities secured by

---

[54] *See* doc. no. 38-1 (Deposition of Plaintiff), at 178.

16

the United States Constitution or federal statutes.[55]  A claim asserted under that statute has two essential elements:  a person whose actions were committed under color of state law, and deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States.[56]

Defendants initially assert that plaintiff did not suffer a deprivation of any rights secured by the Constitution or laws of the United States.  Alternatively, they assert that, even if plaintiff did suffer a deprivation of federally-protected rights, Officer McCulley is entitled to "qualified immunity," which is a defense to a § 1983 claim, and provides "complete protection for governmental officials sued in their individual capacities as long as 'their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Thomas v.*

_____

[55] *See Monroe v. Pape*, 365 U.S. 167, 171 (1961), *overruled on other grounds by Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978); *see also e.g.*, *Burch v. Appalachee Community Mental Health Services, Inc.*, 840 F.2d 797, 800 (11th Cir. 1988) (*en banc*), *aff'd sub nom. Zinermon v. Burch*, 494 U.S. 113 (1990); *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *partially overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).

[56] The pertinent part of the statute provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

17

*Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

> The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, *see Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987), protecting from suit "all but the plainly incompetent or one who is knowingly violating the federal law." *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001).

*Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002); *see also*, *e.g.*, *Chesser v. Sparks*, 248 F.3d 1117, 1121-22 (11th Cir. 2001).

A valid qualified immunity defense has three parts. The defendant must first establish that he was acting within his "discretionary authority" when the acts complained of were committed. *See*, *e.g.*, *Lee*, 284 F.3d at 1194. If the defendant makes that showing, the burden then shifts to the plaintiff to show that qualified immunity is not appropriate by demonstrating the deprivation of a constitutional or federal statutory right that was clearly established when the defendant acted. *See*, *e.g.*, *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009).[57]

While the determination of the question of whether a federal constitutional or

---

[57] Courts were previously required under the Supreme Court's holding in *Saucier v. Katz*, 533 U.S. 194 (2001), to first determine whether "a constitutional right would have been violated on the facts alleged," and then, if "the violation is established," determine "whether the right was clearly established." *Id.* at 200. However, the Court overruled that portion of *Saucier* in *Pearson v. Callan*, 555 U.S. 223 (2009), holding that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Id.* at 236.

statutory right was violated depends upon the right asserted, a common standard is used to determine whether that right was "clearly established."

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell* [*v. Forsyth*, 472 U.S. 511, 535 n.12 (1985)]; but it is to say that *in the light of pre-existing law the unlawfulness must be apparent.*" *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (alteration and emphasis supplied). It also can be said that a right is "clearly established" for purposes of the doctrine of qualified immunity if an earlier decision "gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* The only decisions that can give such warning are those "of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Jenkins by Hall v. Talladega City Board of Education*, 115 F.3d 821, 826 n.4 (11th Cir. 1997). A right also will be deemed to have been "clearly established"

> when "the words of the pertinent federal statute or federal constitutional provision . . . [are] specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law. This kind of case is one kind of 'obvious clarity' case." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (footnote omitted) (emphasis in original). Thus, "the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that

the conduct cannot be lawful." *Id.* (emphasis added).

*Durruthy v. Pastor*, 351 F.3d 1080, 1092 (11th Cir. 2003) (alteration in original).

### 1.      Officer McCulley's discretionary authority

The actions of a governmental official are deemed to have been committed within the official's "discretionary authority" whenever he or she "was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).  Investigating crimes, conducting searches, and making arrests are legitimate job-related functions within the discretionary authority of police officers.[58]   Thus, the burden shifts to plaintiff to show that Officer McCulley's actions violated a clearly established federal constitutional or statutory right.

### 2.      The unlawful arrest claim against Officer McCulley

The preface to Count Three of plaintiff's Second Amended Complaint is entitled "FALSE ARREST PURSUANT TO TITLE 42 U.S.C. § 1983 (BRETT MCCULLEY IN HIS INDIVIDUAL CAPACITY)."[59]  Even so, nowhere within the

---

[58] *See*, *e.g.*, *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004) (holding that making an arrest is within the discretionary authority of a sheriff's deputy); *Hutton v. Strickland*, 919 F.2d 1531, 1537-38 (11th Cir. 1990) (holding that sheriff's deputies acted within their discretionary authority when investigating a suspected crime, making an arrest, and searching a vehicle).

[59] Doc. no. 27 (Second Amended Complaint), at 5.

allegations of that Count does plaintiff mention the Fourth Amendment, or any other provision of the United States Constitution.  Instead, he asserts only that:

> 24.   Based upon the acts described herein, including but not limited to the failure to compare the appearance of the plaintiff with pictures of the offender, and the failure to investigate readily available alibi evidence that established the innocence of the plaintiff, Brett McCulley, acting under color of law, in his individual capacity, acted recklessly, with deliberate indifference, willfully, maliciously and/or in excess of legal authority, in falsely arresting the plaintiff without probable cause or basis in fact or law to do so.

> 25.   As a direct and proximate result of the false arrest of the plaintiff by the defendant, the plaintiff suffered damages as described herein.

> 26.   The plaintiff demands judgment for economic damages, emotional distress, mental anguish and other damages, for compensatory and punitive damages, attorney's fees and costs.[60]

To establish that an arrest violated the Fourth Amendment, the plaintiff must show that the arrest was "unreasonable."[61]  *See, e.g., Brower v. County of Inyo*, 489 U.S. 593, 599 (1989) ("Seizure alone is not enough for § 1983 liability; the seizure must be unreasonable.") (internal quotation marks and citation omitted).  An arrest is unreasonable when it is not supported by probable cause.  *See, e.g., Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).  "Probable cause is defined in terms

---

[60] *Id.* ¶¶ 24-26, at 5.

[61] The Fourth Amendment provides, in pertinent part, that:  "The right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated . . . ."  U.S. Const. amend. IV (1791).

of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Id.* (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). "Probable cause to arrest exists 'where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed.'" *United States v. Pantoja-Soto*, 739 F.2d 1520, 1523 (11th Cir. 1984) (quoting *United States v. Blasco*, 702 F.2d 1315, 1324 (11th Cir. 1983)).

The doctrine of qualified immunity also shields an officer from an unlawful arrest claim even when the officer had only *arguable* probable cause to arrest, as distinguished from *actual* probable case. *See*, *e.g.*, *Jones v. Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1558 (11th Cir. 1993). *Arguable* probable cause exists if "an officer reasonably could have believed that probable cause existed in light of the information the officer possessed." *Durruthy*, 351 F.3d at 1089.

The only issue on plaintiff's false arrest claim is one of identity: that is, did Officer McCulley have probable cause, either actually or arguably, to believe that plaintiff was the person who robbed the Regions Bank in Huntsville?[62]

---

[62] As an initial matter, the parties dispute when plaintiff was arrested. Defendants assert that plaintiff was custodially *detained* at his home, and only formally arrested at the north precinct

Unquestionably, he did.  When Officer McCulley arrested plaintiff, he had several reasons for believing that plaintiff was the bank robber.  Plaintiff's aunt and uncle had *volunteered* their belief that their nephew was the bank robber — if not in terms of absolute certainty, then more likely than not.  They also stated that the clothing worn by the perpetrator during the robbery was the type of clothing typically worn by their nephew.  Officer McCulley also noticed the similarities between the bank surveillance photograph and photographs of plaintiff.    Additionally, plaintiff's physical characteristics were roughly similar (even though not identical) to the physical description of the robber provided by the bank teller.[63]    Lieutenant Stinnett and Deputy Hinton of the Limestone County Sherrif's Department also confirmed that the surveillance photographs of the perpetrator resembled plaintiff.  Finally, when law enforcement officers arrived at plaintiff's home, he ran to the back of his house and hid in the laundry room.[64]

---

headquarters of the Huntsville Police Department.  Plaintiff asserts that he was arrested when he was handcuffed at his home.  Resolution of that dispute is not necessary, because — even assuming *arguendo* that plaintiff is correct, and that he was arrested when handcuffed at his home — Officer McCulley possessed at least arguable probable cause to arrest him at that point.

[63] Plaintiff was 28 years old, a white male, and 5'11" or 6'0" tall at the time of the robbery. *See* doc. no. 38-25 (Plaintiff's Booking Sheet), at 2; doc. no. 38-1 (Deposition of Plaintiff), at 264. In his deposition plaintiff testified that he is 6'0" tall, whereas his booking sheet lists his height as 5'11," whereas the robber was described as being in his mid-30s, a white male, and approximately 6'2" tall.  Doc. no. 37 (Brief in Support of Motions for Summary Judgment), at 2; Doc. no. 42 (Brief in Opposition to Motions for Summary Judgment), at 1; doc. no. 38-4 (Deposition of Jermaine Edwards), at 12-14; doc. no. 38-34 (Written Statement of Jermaine Edwards).

[64] Most Circuits — including the Eleventh — admit evidence of flight to demonstrate a "consciousness of guilt, or "as an admission of guilt by conduct."  *See, e.g., United States v. Frazier,*

A positive identification of an individual as the perpetrator of a crime by comparison of photographs may establish probable cause to arrest the individual for that crime.[65]   Furthermore, even a rough description of the perpetrator of a crime may create arguable probable cause to arrest a person who matches that description.[66]

In *Rushing v. Parker*, 599 F.3d 1263 (11th Cir. 2010) (*per curiam*), a panel of the Eleventh Circuit confronted the issue of liability under § 1983 where the plaintiff was mistakenly identified as the perpetrator of a crime and arrested.  There, the victim

---

387 F.3d 1244, 1266 n.20 (11th Cir. 2004) (*en banc*) ("Frazier's long and harrowing flight from the police — at speeds up to 100 miles per hour — was strong evidence of consciousness of guilt."); *United States v. Blakey*, 960 F.2d 996, 1000 (11th Cir. 1992) (evidence of flight admissible to demonstrate consciousness of guilt and thereby guilt itself) (citing *United States v. De Perias*, 805 F.2d 1447, 1454 (11th Cir. 1986)); *United States v. Dillon*, 870 F.2d 1125, 1126 (6th Cir. 1989) ("Flight evidence comes in as an admission of guilt by conduct.").  It is circumstantial evidence that may give rise to an *inference — not* a presumption — of guilt; and "juries are given the power to determine how much weight should be given to such evidence."  *United States v. Gaitan-Acevedo*, 148 F.3d 577, 588 (6th Cir. 1998) (addressing evidence of *flight*, and quoting *United States v. Touchstone*, 726 F.2d 1116, 1119 (6th Cir. 1984)) (internal quotation marks omitted); *see also United States v. Beard*, 775 F.2d 1577, 1581 (11th Cir.) ("There is no question that evidence of flight can raise *a permissive inference* of consciousness of guilt of the crime charged." (emphasis supplied)), *cert. denied*, 475 U.S. 1030 (1985).

[65] *See, e.g.*, *United States v. Scheets*, 188 F.3d 829, 837-38 (7th Cir. 1999) (finding probable cause to arrest where police officers compared a photograph of the perpetrator at the crime scene produced by a surveillance camera with a photograph of the arrestee and the arrestee himself); *United States v. Harris*, 956 F.2d 177, 179-80 (8th Cir. 1992) (finding probable cause to arrest an individual for murder where witnesses identified the individual as the murderer from a series of photographs); *see also* 2 Wayne R. LaFave, *Search and Seizure* § 3.4(c) (4th ed. 2004) ("[T]he lower courts have rather consistently held that the identification of a person's photo by a victim or witness as the individual they saw engaged in criminal activity constitutes probable cause [to arrest] with respect to that person . . . .") (alteration supplied).

[66] *See, e.g.*, *United States v. Johnson*, 741 F.2d 1338, 1340 n.2 (11th Cir. 1984) ("The officers had probable cause to arrest [the defendant]; about half an hour after the robbery, he was driving a car that was seen leaving the scene of the crime right after the crime occurred, and he fit the rough description given of the robber."); *see also* 2 LaFave, *Search and Seizure* § 3.4(c) (collecting cases).

reported to law-enforcement that he had been victimized by an individual he had hired to repair his roof. *Id.* at 1265. The victim filed a complaint against the perpetrator by name, but the name given by the victim was not the full name of the perpetrator, but was instead the name of the plaintiff. *Id.* at 1268. As in the present case, the victim later identified the plaintiff as the perpetrator from a "photographic lineup." *Id.* The court held that there was "no evidence that [the defendant officer] had reason to believe the perpetrator was anyone other than the Plaintiff, given the victim's complaint and identification"; thus, "a reasonable officer [in the defendant officer's] situation could have followed a similar course of action and believed that probable cause existed." *Id.* at 1268. In reaching that holding, the court made clear that mistakes, by officers or victims, do not obviate *arguable* probable cause to make an arrest, so long as the mistake was reasonable. *See id.* at 1267-68.

The Eleventh Circuit's opinion in *Brock v. City of Zephyrhills*, 232 F. App'x 925 (11th Cir. 2007), also is instructive. Even though the opinion is not binding authority or of precedential value because the decision is unreported, it is a factually similar case. There, an individual robbed a bank, and a police officer named Kirk obtained a video tape from a surveillance camera and statements from witnesses, including a physical description of the perpetrator and a description of his vehicle. *Id.* at 926. Kirk published photographs from the surveillance camera in the local

25

newspaper and distributed copies to other law-enforcement agencies. *Id.*  A fellow law-enforcement officer, Kramer, identified the plaintiff as the perpetrator.  *Id.* Kramer also showed the picture to several members of the plaintiff's family, all of whom identified their relative as the perpetrator.  *Id.*  Based on the identifications by members of the plaintiff's family, identification of the plaintiff in a "photographic lineup" by two out of three witnesses from the bank, and the fact that the plaintiff owned a vehicle matching a description of the perpetrator's vehicle, Kirk arrested the plaintiff.  *Brock*, 232 F. App'x at 926-27.  The Eleventh Circuit held that, based on those facts, *actual* probable cause existed for the plaintiff's arrest, and that the defendant officers were entitled to qualified immunity on the unlawful arrest claim. *Id.* at 928.

Plaintiff asserts several grounds for his argument that the identification information supplied to Officer McCulley in this case did not support a finding of either actual or arguable probable cause.  First, plaintiff argues that the identification volunteered by his uncle and aunt did not establish probable cause, because neither *conclusively* identified him as the bank robber.[67]  Nevertheless, even the equivocal nature of their *volunteered* identifications may be considered when determining whether there was probable cause to arrest.  The information to be taken into account

---

[67] Brief in Opposition to Motions for Summary Judgment, at 15.

is the *totality of facts* available to Officer McCulley at the time of the arrest. *See United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007) ("Probable cause to arrest exists when the totality of the facts and circumstances support 'a reasonable belief that the suspect had committed or was committing a crime.'") (quoting *United States v. Gordon*, 231 F.3d 750, 758 (11th Cir. 2000)).

Plaintiff also argues that all of the identifications made by comparing his appearance to the photograph of the perpetrator taken by the bank's surveillance camera cannot support a finding of either actual or arguable probable cause because of visible differences between plaintiff's appearance and the photograph of the perpetrator. Plaintiff asserts that the photographs of the perpetrator show that the perpetrator "had no hair on the sides or the back of his head below the rim of the baseball cap he was wearing," and that plaintiff had "a full head of hair on the day of the robbery."[68] However, plaintiff has not presented any *evidence* to support that assertion in his brief.[69] Furthermore, a comparison of a photograph which appears to depict the length of plaintiff's hair on the date of the robbery with the surveillance camera photographs of the robber does not show that, had plaintiff been the robber,

---

[68] Doc. no. 42 (Brief in Opposition to Motions for Summary Judgment), at 17.

[69] *See* doc. no. 38-28 (Plaintiff's Mug Shot). In his deposition, plaintiff was presented with three "mug shot" photographs marked as "Defendant's Exhibit No. 5," and asked if they depicted the length of his hair on the day of the robbery. *See* doc. no. 38-1 (Deposition of Plaintiff), at 212-214. In response, plaintiff stated: "My hair was long, yeah. It was like that." *Id.* at 214. Neither plaintiff nor defendants included the exhibits used at plaintiff's deposition in the evidentiary record on the present motions for summary judgment.

his hair "would have been visible in the surveillance photographs."[70]   Rather, a reasonable law-enforcement officer could conclude in good faith that hair of the length of plaintiff's hair on the day of the robbery would not be visible in the surveillance photograph because of the baseball cap worn by the perpetrator.[71]

Plaintiff also argues that he has "a tattoo on the side of his neck and a large tattoo on the front of his chest at the neck line," but the photographs from the bank show that the perpetrator "is wearing an open collared shirt and no tattoos are visible."[72]   Again, a comparison of the surveillance camera photographs with photographs depicting the tattoo on plaintiff's neck show that a reasonable law-enforcement officer could believe in good faith that the surveillance photograph depicted the tattoo on plaintiff's neck.[73]   Indeed, Officer McCulley had the surveillance photographs enhanced, in order to better determine whether the robber had plaintiff's tattoo on his neck, and the enhanced image appears to show a tattoo resembling plaintiff's tattoo at the same location on the neck of the perpetrator.[74] Furthermore, there is no evidence of record to establish the location of the tattoo on plaintiff's chest.  Plaintiff relies solely on a conclusory assertion in his brief that the

---

[70] Brief in Opposition to Motions for Summary Judgment, at 10.

[71] *Compare* Plaintiff's Mug Shot, *with* doc. no. 38-26 (Surveillance Camera Photographs).

[72] Brief in Opposition to Motions for Summary Judgment, at 17.

[73] *Compare* Plaintiff's Mug Shot, *with* Surveillance Camera Photographs.

[74] *See* doc. no. 38-29 (Comparison of Enhanced Surveillance Photograph with Photograph of Plaintiff's Neck).

tattoo on his chest would have been visible if plaintiff was wearing the shirt the perpetrator was wearing in the surveillance photograph.[75] Thus, the court cannot find that the lack of a tattoo on the chest of the perpetrator in the surveillance photograph made Officer McCulley's belief that plaintiff was the perpetrator unreasonable.

Plaintiff also argues that the physical description of the bank robber was so dissimilar from his own physical characteristics that a reasonable officer could not believe that he was the perpetrator. Jermaine Edwards, the bank teller, described the robber as a white male in his mid-30s, approximately 6'2" tall, and wearing a blue jacket and baseball cap.[76] In comparison, plaintiff was 28 years old and 5'11" to 6'0" tall at the time of the robbery.[77] The similarities between plaintiff and the description of the perpetrator, while not identical, are sufficiently close to support a finding of arguable probable cause, especially when one considers that eye-witness identifications often are formed in brief, stressful encounters.

---

[75] *See* Brief in Opposition to Motions for Summary Judgment, at 9 ("The robber in the surveillance photographs was wearing an open collar shirt and both of [plaintiff's] tattoos would have been visible on the surveillance photographs if the offender had been [plaintiff].") (alterations supplied); doc. no. 44 (Reply Brief in Support of Motions for Summary Judgment), at 1 ("Admitted Investigator McCulley observed two tattoos on [plaintiff]; disputed the surveillance photographs clearly show the absence of tattoos on the robber.") (alteration supplied).

[76] Doc. no. 37 (Brief in Support of Motions for Summary Judgment), at 2; Brief in Opposition to Motions for Summary Judgment, at 1; doc. no. 38-4 (Deposition of Jermaine Edwards), at 12-14; doc. no. 38-34 (Written Statement of Jermaine Edwards); *see also* Surveillance Camera Photographs.

[77] *See* doc. no. 38-25 (Plaintiff's Booking Sheet), at 2; doc. no. 38-1 (Deposition of Plaintiff), at 264. In his deposition plaintiff testified that he is 6'0" tall, whereas his booking sheet lists his height as 5'11".

In addition to the identifications of plaintiffs as the perpetrator, other information supporting probable cause to arrest was available to Officer McCulley at the time of the arrest. An individual's prior convictions support a finding of probable cause to arrest, so long as the prior conviction had probative value to the arresting officer in concluding that the arrestee committed a crime. *See Brinegar v. United States*, 338 U.S. 160, 172-78 (1949) (holding a police officer's knowledge of an individual's prior arrest and pending charges contributed to a finding of probable cause); *Lindsey*, 482 F.3d at 1292 (holding that the knowledge of police officers that the defendant was previously convicted of armed robbery added to a finding of probable cause to arrest for being a felon in possession of a firearm). *See also*, *e.g.*, 2 Wayne R. LaFave, *Search and Seizure* § 3.2(d) (4th ed. 2004) (collecting cases). To be of probative value the crime for which the arrestee was convicted must be similar to the crime for which the suspect was arrested. *See Brinegar*, 338 U.S. at 171-78; *Lindsey*, 482 F.3d at 1292; *see also* 2 LaFave, *Search and Seizure* § 3.4(c) ("The relevancy determination, then, depends in part upon whether there is a relationship in kind between the prior and present offense."). Here, Officer McCulley knew that plaintiff had a prior conviction for armed robbery, a similar offence to the one for which Officer McCulley arrested him.

Finally, as previously observed, when Officer McCulley arrived at plaintiff's

home, plaintiff ran and McCulley found him hiding in a dark laundry room.  An effort to avoid interaction with the police through flight, hiding, or other furtive actions supports a finding of probable cause.[78]

In sum, when the totality of facts known to Officer McCulley at the time he arrested plaintiff is taken into account, it becomes unequivocally clear that a person of reasonable caution could believe in good faith that plaintiff had committed the armed robbery of the Regions Bank branch in Huntsville on November 26, 2008. Thus, Officer McCulley had probable cause to arrest plaintiff, and the arrest did not violate the Fourth Amendment.  Accordingly, summary judgment is due to be entered in favor of Officer McCulley on plaintiff's unlawful arrest claim.

### 3.    The false imprisonment claim against Officer McCulley

Count Five of plaintiff's Second Amended Complaint, like the third count discussed in the preceding section, is neither a model of clarity, nor an example of good pleading.  Once again, even though the preface to the claim is entitled "COUNT FIVE — FALSE IMPRISONMENT PURSUANT TO TITLE 42 U.S.C. § 1983 (BRETT MCCULLEY IN HIS INDIVIDUAL CAPACITY),"[79] plaintiff does not

---

[78] *See supra note* 64.  *See also Sibron v. New York*, 392 U.S. 40, 66-67 (1968) ("[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest."); *see also* 2 LaFave, *Search and Seizure* § 3.6(e) (collecting cases).

[79] Doc. no. 27 (Second Amended Complaint), at 6.

mention anywhere within the four corners of that Count the Fourteenth Amendment:
the Constitutional provision prohibiting a deprivation of "liberty" (*i.e.*, a wrongful
incarceration) without due process of law.  *See, e.g., Cannon v. Macon County*, 1 F.3d
1558, 1562-63 (11th Cir. 1993).  Instead, plaintiff asserts only that:

> 32.    Based upon the acts described herein, including but not
> limited to the execution of an affidavit attesting probable cause to
> believe the plaintiff committed the offense complained of; the ongoing
> failure to compare the appearance of the plaintiff with pictures of the
> offender; the false report that a picture of the offender showed a tattoo
> that matched a tattoo on the neck of the plaintiff; and the ongoing failure
> to investigate readily available alibi evidence that established the
> innocence of the plaintiff, Brett McCulley, acting under color of law,
> acted recklessly, with deliberate indifference, willfully, maliciously
> and/or in excess of legal authority, in falsely imprisoning the plaintiff for
> 65 days.

> 33.    As a direct and proximate result of the false imprisonment
> of the plaintiff by the defendant, the plaintiff suffered damages as
> described herein.

> 34.    The plaintiff demands judgment for economic damages,
> emotional distress, mental anguish and other damages, for compensatory
> and punitive damages, attorney's fees and costs.[80]

Some confusion exists regarding the distinction between a Fourth Amendment
false *arrest* claim, on the one hand, and a Fourteenth Amendment false *imprisonment*
claim on the other.  As noted in the previous section, the Fourth Amendment provides
a right to be "free from unreasonable . . . seizures,"[81] whereas the Fourteenth

---

[80] *Id.* ¶¶ 32-34, at 6.

[81] U.S. Const. amend. IV (1791).  *See supra* note 61.

Amendment provides a right to be free from the deprivation of "liberty . . . without due process of law."[82]  It is not always clear when an "unreasonable seizure" giving rise to a Fourth Amendment false arrest claim ends, and a Fourteenth Amendment false imprisonment claim begins.  For that reason, false arrest and false imprisonment claims asserted against state officials under 42 U.S.C. § 1983 often appear to overlap either partially or entirely.  Even though no clear dividing line between the two claims has been established in case law, "[t]he initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause." *Pierce v. Gilchrist*, 359 F.3d 1279, 1285-86 (10th Cir. 2004).

Resolution of that conundrum is not necessary to reach a decision on the defendants' present motions for summary judgment, however, because plaintiff asserts both false arrest and false imprisonment claims.  *See id.* at 1286 ("It is not necessary in this case to determine where Fourth Amendment analysis ends and due process analysis begins, because [the plaintiff] raised claims under both constitutional provisions, and neither party argues that the difference in standards has any bearing on this appeal of the denial of the motion to dismiss.").

---

[82] In relevant part, the Fourteenth Amendment provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law; . . . ."  U.S. Const. amend. XIV (1868).

As discussed above, § 1983 provides a cause of action only for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States by any person acting under color of state law. 42 U.S.C. § 1983. Thus, because an incarceration gives rise to a § 1983 claim only when the imprisonment is unconstitutional, the § 1983 cause of action is significantly limited in comparison to the common law tort of false imprisonment, as explained in more detail below. *See, e.g., Cannon*, 1 F.3d at 1562-63.

Discussion of a cause of action for false imprisonment under § 1983 was given its first major treatment in the case of *Baker v. McCollan*, 443 U.S. 137 (1979). There, the appellant, Linnie McCollan, had a brother, Leonard McCollan, who had obtained a driver's license in Linnie's name, but displaying his (Leonard's) photograph. *Id.* at 140-41. Thereafter, when Leonard McCollan was arrested on narcotics charges, he identified himself as his brother, Linnie, was booked as Linnie, and was released on bail as Linnie. *Id.* at 141. When Leonard failed to appear on the narcotics charges, a warrant was issued for the arrest of Linnie. *Id.* It was the misfortune of poor, innocent Linnie to later be stopped by police for a traffic violation and arrested pursuant to the warrant. *Id.* Despite repeated protests of his innocence, Linnie was imprisoned by for three days before the county sheriff realized that the wrong person had been arrested, and released Linnie from custody. *Id.* Linnie

brought a § 1983 claim against the sheriff and the sheriff's insurer.  On appeal from a grant of summary judgment in favor of the defendants, the former Fifth Circuit Court of Appeals reversed the district court, and held that Linnie had established a *prima facie* false imprisonment claim because he satisfied all elements of the common-law tort.  *See Baker*, 443 U.S. at 141.  The Circuit opinion then considered whether the defendant sheriff was entitled to the defense of qualified immunity, and concluded that a reasonable jury could find that he acted unreasonably and, thus, was not entitled to qualified immunity.  *Id.*

The Supreme Court reversed, holding that Linnie failed to establish a false-imprisonment claim that was cognizable under § 1983.  The Court held that a false imprisonment claim under § 1983 implicates the Fourteenth Amendment "protection against deprivations of liberty without due process of law," and distinguished that claim from the common-law tort of false imprisonment on the basis that a § 1983 claim requires that the incarceration be unconstitutional.  *Id.* at 142.  The Court held that Linnie failed to make out a valid § 1983 claim because he could not show an alleged constitutional violation, saying that "a detention of three days over a New Year's weekend does not and could not amount to such a deprivation" of "liberty . . . without due process of law."  *Id.*  In other words, the Court held that when a person is taken into custody pursuant to a constitutionally valid arrest warrant, or (as in the

35

present case) pursuant to an arrest based upon probable cause, the detention of that person for a short period of time is, despite the person's protests of innocence and actual innocence, not a violation of the Fourteenth Amendment protection against a deprivation of liberty without due process of law.  The Court left open the issue of whether, after some unspecified period of custody, the continued detention of an individual in the face of his protests of innocence would be a violation of the Fourteenth Amendment.  *Baker*, 443 U.S. at 145 ("We may even assume, *arguendo*, that, depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law.'") (quoting U.S. Const. amend. XIV (1868)).

The Eleventh Circuit has recognized a § 1983 false imprisonment cause of action subject to the limitations on that claim imposed by the decision in *Baker v. McCollan* (*see Cannon*, 1 F.3d at 1562-63; *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980)),[83] and defined the elements of such a claim in the following passage from the decision in *Campbell v. Johnson*, 586 F.3d 835 (11th Cir. 2009) (*per curiam*):

---

[83] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

> A § 1983 claim of false imprisonment requires a showing of [facts satisfying the *prima facie* elements of both] common law false imprisonment and a due process violation under the Fourteenth Amendment. *See Cannon v. Macon County*, 1 F.3d 1558, 1562-63 (11th Cir. 1993), *modified on other grounds*, 15 F.3d 1022 (1994). The elements of common law false imprisonment are an intent to confine, an act resulting in confinement, and the victim's awareness of confinement. *See id.* at 1562 n. 3. The Fourteenth Amendment Due Process Clause includes the "right to be free from continued detention after it was or should have been known that the detainee was entitled to release." *Id.* at 1563; *West v. Tillman*, 496 F.3d 1321, 1327 (11th Cir. 2007) (*per curiam*). To establish a due process violation, [the plaintiff] must prove that [the defendant] acted with deliberate indifference. *See Tillman*, 496 F.3d at 1327. This means that [the defendant] had subjective knowledge of a risk of serious harm and disregarded that risk by actions beyond mere negligence. *See id.*

*Id.* at 840 (alterations supplied).

The parties do not dispute that the elements of a common-law false imprisonment claim are satisfied.[84] The sole issue is whether Officer McCulley acted with deliberate indifference when imprisoning plaintiff, and retaining him in custody for sixty-six days. Comparison of two Eleventh Circuit decisions applying the deliberate indifference standard to § 1983 false imprisonment claims will clarify what that standard requires.

First, in *Cannon v. Macon County*, 1 F.3d 1558 (11th Cir. 1993), a panel of the Eleventh Circuit found deliberate indifference creating a false imprisonment claim

---

[84] *See* doc. no. 37 (Brief in Support of Motions for Summary Judgment), at 29-30; doc. no. 42 (Brief in Opposition to Motions for Summary Judgment), at 24-26; doc. no. 44 (Reply Brief in Support of Motions for Summary Judgment), at 5-7.

based upon the following facts.  The plaintiff was traveling, ran out of money, stopped her automobile at a rest area to telephone relatives for help, and spent the night at the rest area while waiting for help to arrive.  *Id.* at 1560.  The following day, the plaintiff was questioned by a sheriff's deputy patrolling the rest area, and she provided the deputy with her name.  *Id.*  The deputy radioed her name to the sheriff's office, and was informed that a person using the plaintiff's name as an *alias* was wanted in another state according to information maintained by the National Crime Information Center ("NCIC").  *Id.*  The deputy arrested the plaintiff and transported her to jail.  *Id.* A second sheriff's deputy, Collins, completed an arrest report.  *Id.*  Collins copied the identifying information written on the arrest report directly from the NCIC report on the wanted individual, rather than asking plaintiff for the information or copying the information from plaintiff's driver's license that was stored in a filing cabinet in the sheriff's office.  *Cannon*, 1 F.3d at 1560.  The plaintiff and the description of the wanted individual from the NCIC report differed in the following ways:  the plaintiff was 5'1" tall, whereas the wanted individual was 5'5"; the plaintiff had blue eyes, but the wanted individual had brown eyes; the plaintiff's middle initial was different from the middle initial of the wanted individual; the two had different social security numbers; and the plaintiff was twelve years younger than the wanted individual.  *Id.* The court held that "Collins' failure to take any steps to identify [the plaintiff] as the

wanted fugitive was sufficient to raise a question of fact as to his deliberate indifference toward the plaintiff's due process rights." *Id.* at 1564. The court also held that Collins was not entitled to claim qualified immunity, because the constitutional right allegedly violated was clearly established — "a reasonable official in Collins' position would have known that Collins' conduct could violate Cannon's fourteenth amendment right not to be falsely imprisoned" without due process of law. *Id.* at 1565.

In contrast, a panel of the Eleventh Circuit found that the plaintiff in *West v. Tillman*, 486 F.3d 1321 (11th Cir. 2007), did not make out a cognizable, Fourteenth Amendment false imprisonment claim because the defendant law-enforcement officers had not acted with deliberate indifference. The plaintiff was an inmate of a county jail, and a court entered an order that should have caused him to be released. *Id.* at 1324-26. When the court order was sent to the jail, the order should have been entered into the jail's computer system, then the "jail card" should have been sent to the jail's docket department and, at that point, the plaintiff should have been released. *Id.* at 1325. Instead, the release order for the plaintiff was entered into the computer system, but the "jail card" was not delivered to the docket department. *Id.* The plaintiff remained incarcerated for twenty-three days beyond the date on which the court had ordered his release. *Id.* Throughout those twenty-three days, the plaintiff

39

made several inquiries with jail officials concerning his release. *West*, 486 F.3d at 1325. In response to one such request, a jail official called the records department and asked whether the plaintiff should be released. *Id.* A jail official employed in the records department then requested an additional copy of the order from the court and entered that order into the computer system; but, yet again, the "jail card" was not delivered to the docket department. *Id.* Despite that series of errors, the Eleventh Circuit held that the plaintiff failed to show that the defendant jail officials acted with *deliberate* indifference, because the plaintiff could not show that the officials subjectively knew that their actions would cause him to be improperly detained, or that they disregarded such a risk. *See id.* at 1327-28. The court found that "the evidence shows — at most — that [the defendant officials] were negligent in failing to carry out their responsibilities." *Id.* at 1327.

Returning to the case before this court, plaintiff must show that Officer McCulley knew, or should have known, of a significant risk that plaintiff was wrongfully imprisoned (*i.e.*, was innocent) in order to establish a subjective belief of a significant risk of harm, but the evidence of record does not rise to that level. To the contrary, as discussed above in relation to plaintiff's false arrest claim, Officer McCulley had probable cause to believe at the time plaintiff was arrested that he had robbed the Regions Bank in Huntsville. Additionally, none of the information Officer

McCulley learned between the date on which plaintiff was arrested and the date of his release from jail caused, or reasonably should have caused, McCulley to believe that there was a significant risk that he had arrested and detained the wrong man. Admittedly, some of the information was inconclusive as to plaintiff's guilt or innocence, but the information indicating that plaintiff may have been (as he ultimately was determined to be) innocent was not of such quality or strength that Officer McCulley should have believed that plaintiff was innocent.

Specifically, Officer McCulley learned the following information that supported his belief that plaintiff was the perpetrator after plaintiff's arrest and detention:  the bank teller to whom the robber presented his demand note, Jermaine Edwards, identified plaintiff as the perpetrator after viewing a "photographic lineup"; enhancement of surveillance camera footage appeared to show the same tattoo on the perpetrator's neck as the tattoo on plaintiff's neck; and a detective in Kingsport, Tennessee informed Officer McCulley that the description of the perpetrator of the Huntsville Regions Bank robbery matched the description of the perpetrator of a bank robbery in Tennessee.

Officer McCulley's attempt to compare fingerprints from the crime scene to plaintiff's fingerprints was inconclusive, because no fingerprints of value could be lifted from either the demand note or the crime scene.  Also, his attempt to verify

plaintiff's *alibi* by reviewing surveillance footage from the gasoline station that plaintiff said he had visited on the day of the robbery was inconclusive, because the videotape did not bear either a date or time stamp.

McCulley did learn that several individuals allegedly could provide *alibi* statements for plaintiff. However, he reasonably could have viewed the statements with suspicion for several reasons. First, he knew that Bridget Gatlin was in a long-term, romantic relationship with plaintiff that had produced two children. Second, the alibi provided by Wise and McCurry was contradicted by his investigation. When he drove to the Priceville repair shop that Wise and McCurry said they had visited with plaintiff, the owner and employees all denied that plaintiff, Wise, or McCurry had been there on the day of the robbery.

Even if plaintiff could show that Officer McCulley had a subjective belief of plaintiff's innocence and, therefore, a significant risk of harm flowing from his continued detention, plaintiff cannot show that McCulley acted with more than mere negligence. McCulley went to great lengths in an attempt to determine the validity of plaintiff's *alibi*. Specifically, he took statements from Wise and McCurry. He traveled to the Moulton gasoline station where plaintiff said they had stopped on the morning of the robbery, spoke to the manager there, and reviewed the surveillance camera footage from the store. He traveled to the Priceville repair shop where

42

plaintiff said that he, Wise, and McCurry had delivered a truck on the day of the robbery, and spoke to the owner and employees there. Officer McCulley also took significant steps to collect other evidence of plaintiff's guilt or innocence. He enhanced photographs of the perpetrator from the surveillance camera footage at the bank to determine whether plaintiff and the perpetrator have the same tattoo on the neck, presented a photographic lineup to the bank teller, and checked to determine if fingerprints had been recovered from the crime scene.

Because plaintiff cannot show that Officer McCulley possessed a subjective belief of his innocence and, thereby, was deliberately indifferent to a significant risk of harm, summary judgment is due to be entered in favor of Officer McCulley on plaintiff's false imprisonment claim.

**4.    Unreasonable search**

It is not at all clear that plaintiff asserts that Officer McCulley conducted an unreasonable, warrantless search of his home in violation of the Fourth Amendment. Court One of his complaint reads as follows:

COUNT ONE

VIOLATION OF THE PLAINTIFF'S CIVIL RIGHTS
PURSUANT TO TITLE 42 U.S.C. § 1983
(BRETT MCCULLEY IN HIS INDIVIDUAL CAPACITY)

15.    Paragraphs 1 - 14 are incorporated herein by reference.

43

16.     Based upon the acts described herein, Brett McCulley, in his individual capacity, acting under color of law, in his individual capacity, acted recklessly, with deliberate indifference, willfully, maliciously and/or in excess of legal authority, in violation of the Fourth and Fourteenth Amendments to the United States Constitution, including but not limited to the right not to be deprived of liberty without due process of law.

17.     As a direct and proximate result of the violation of the plaintiff's constitutional rights by the defendant, the plaintiff suffered damages as described herein.

18.     The plaintiff demands judgment for economic damages, emotional distress, mental anguish and other damages, for compensatory and punitive damages, attorney's fees and costs.[85]

Plaintiff's brief in response to defendants' motions for summary judgment alleges that Officer McCulley's "warrantless and non-consensual *entry into* plaintiff's residence was illegal."[86]  However, plaintiff's second amended complaint does not specifically assert a claim based upon the *search* of his home.  Indeed, the quotation set out above does not even allege that plaintiff's home was searched.  Consequently, plaintiff cannot assert such a claim for the first time in a brief opposing summary judgment.

It should be noted that plaintiff was provided two opportunities to amend his pleadings.  He was permitted to file a first amended complaint in response to a motion

---

[85] Doc. no. 27 (Second Amended Complaint) ¶¶ 15-18, at 4.

[86] Doc. no. 42 (Brief in Opposition to Motions for Summary Judgment), at 18 (emphasis supplied).

for a more definite statement and motions to dismiss filed by defendants.[87]  The court

ordered plaintiff to file a second amended complaint after ruling on a second round

of motions to dismiss filed by the defendants.[88]

Moreover, even if plaintiff's complaint had specifically alleged that Officer

McCulley unconstitutionally searched his home, that claim would fail on the merits

as a matter of law.  The entry into plaintiff's home by Officer McCulley was lawful

because probable cause and exigent circumstances existed.  *See, e.g., Kirk v.*

*Louisiana*, 536 U.S. 635, 637 (2002) (holding that law enforcement officers lawfully

may enter a home without a warrant when probable cause and exigent circumstances

are present).  "Exigent circumstances" include "danger of flight or escape, loss or

destruction of evidence, risk of harm to the public or the police, mobility of a vehicle,

and hot pursuit."  *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002).

As discussed previously, in relation to plaintiff's false arrest claim, Officer

McCulley had probable cause to believe that plaintiff had committed the violent crime

of armed robbery.  Based on the demand note passed to the bank teller, the officers

had reason to believe that plaintiff was both armed and willing to use his weapon ("I

got a gun . . .  I will shoot you").  Officer McCulley also knew that plaintiff had

previously committed a violent crime due to his conviction for armed robbery.

---

[87] *See* doc. no. 6 (Motion to Amend Complaint); doc. no. 7 (First Amended Complaint).

[88] *See* doc. no. 25 (Memorandum Opinion and Order on Motions to Dismiss).

Finally, and most importantly, as the officers approached the home, plaintiff was observed running away from them, toward the back of the home.  The officers reasonably could have believed that plaintiff was attempting to evade arrest, or to hide or destroy evidence, or to obtain a weapon in order to attack the officers.  Thus, the exigent circumstances of "danger of flight or escape, loss or destruction of evidence, [and] risk of harm to the public or the police" existed when Officer McCulley entered plaintiff's home.  *Holloway*, 290 F.3d at 1334.  Due to the presence of probable cause and exigent circumstances, Officer McCulley's warrantless entry into and search of plaintiff's home was constitutional.  *See*, *e.g.*, *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) ("A warrantless search is allowed . . . where both probable cause and exigent circumstances exist." ).  One exigent circumstance permitting a warrantless search is the threat of the destruction or removal of evidence, and the test for whether that exigent circumstance exists is "whether the facts would lead a reasonable, experienced agent to believe that evidence might be destroyed or removed before a warrant could be secured."  *United States v. Reid*, 69 F.3d 1109, 1113 (11th Cir. 1995).

When Officer McCulley arrested plaintiff, any evidence linking plaintiff to the bank robbery would have remained inside the home and under the control of plaintiff's girlfriend Bridget Gatlin.  As plaintiff's girlfriend and the mother of his

46

children, Gatlin's relationship with plaintiff potentially created a motivation for her to hide, remove, or destroy evidence of the crime. *See*, *e.g.*, *United States v. Gardner*, 553 F.2d 946, 948 (5th Cir. 1977) (indicating that the risk of the destruction of evidence was heightened because the individual inside the home searched was the defendant's wife). Gatlin was initially untruthful when telling McCulley that plaintiff was not home. It would be reasonable to assume that, if she was willing to lie to the police about plaintiff's whereabouts, she also would be willing to hide, remove, or destroy evidence on his behalf. Additionally, the events that transpired at plaintiff's home began at 7:45 p.m. on November 26, 2008, the day before Thanksgiving. At that time on the day before a major state and national holiday, the delay in obtaining a warrant likely would have been substantial. *See*, *e.g.*, *United States v. Bartelho*, 71 F.3d 436 (1st Cir. 1995) (observing that "any normal delay in obtaining a warrant might have been exacerbated by the holiday"). For those reasons, Gatlin's presence in the home created a risk that she would remove or destroy evidence, and the probable delay required to obtain a warrant was unreasonable in light of that risk. Thus, the exigent circumstance of the potential destruction or removal of evidence justified Officer McCulley's search of plaintiff's home.

## B.   The § 1983 Claims Against the City of Huntsville

Plaintiff asserts claims for false arrest, false imprisonment, and failure to

implement proper policies and procedures against the City of Huntsville, alleging that each is based upon "violation of the plaintiff's civil rights pursuant to title 42 U.S.C. § 1983." As discussed in the previous sections of Part A in this opinion, plaintiff has failed to present evidence establishing that Officer McCulley violated his constitutional rights. Consequently, the City of Huntsville is not liable to plaintiff under § 1983, s*ee*, *e.g.*, *City of Los Angeles v. Heller*, 475 U.S. 796 (1986), and summary judgment is due to be entered in favor of the City of Huntsville.

## C.    State Law Claims

In cases where the court's original jurisdiction is based upon a federal question, the district court has discretion to entertain state-law claims that are supplemental to the federal claim. *See* 28 U.S.C. § 1367(a).[89] The district court may decline to exercise supplemental jurisdiction when:

(1)    the claim raises a novel or complex issue of State law,

(2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

---

[89] 28 U.S.C. § 1367(a) provides that:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

48

>    (3)    the district court has dismissed all claims over which it has
>           original jurisdiction, or
>
>    (4)    in exceptional circumstances, there are other compelling reasons
>           for declining jurisdiction.

28 U.S.C. § 1367(c).  The Supreme Court added a gloss to this statutory language in

*Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988), when observing that

> a federal court should consider and weigh in each case, and at every
> stage of the litigation, the values of judicial economy, convenience,
> fairness, and comity in order to decide whether to exercise jurisdiction
> over a case brought in that court involving pendent [now
> "supplemental"] state-law claims.  When the balance of these factors
> indicates that a case properly belongs in state court, *as when the
> federal-law claims have dropped out of the lawsuit in its early stages
> and only state-law claims remain*, the federal court *should decline* the
> exercise of jurisdiction by dismissing the case without prejudice.

*Id*. at 349-50 (emphasis supplied) (citing *United Mine Workers of America v. Gibbs*,

383 U.S. 715, 726-27 (1966)).  "[I]n the usual case in which all federal-law claims are

eliminated before trial, the balance of factors to be considered under the pendent

jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will

point toward declining to exercise jurisdiction over the remaining state-law claims."

*Carnegie-Mellon*, 484 U.S. at 350 n.7; *see also L.A. Draper & Son V. Wheelabrator-*

*Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (stating that "if the federal claims are

dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state

claims").

Summary judgment is due to be granted in favor of both defendants on plaintiff's federal claims.  Therefore, the balance of factors weigh in favor of declining supplemental jurisdiction, and this court exercises its discretion to dismiss plaintiffs' state law claims.

### III.  CONCLUSION AND ORDER

For the foregoing reasons, defendants' motions for summary judgment are due to be, and hereby are, GRANTED in part.  Summary judgment is entered in favor of the City of Huntsville, Alabama, and Officer Brett McCulley on all federal claims asserted in plaintiff's second amended complaint, and those claims are dismissed with prejudice.  Plaintiff's state-law claims are DISMISSED without prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

**DONE** and **ORDERED** this 19th day of July, 2012.

United States District Judge

50